GO-TANE SERVICE STATIONS, INC., Plaintiff-Appellant, *v.* JAMES D. SHARP, Defendant.—(BANK OF WESTMONT, ILLINOIS, Defendant-Appellee.)

Second District    No. 79-92

Opinion filed November 20, 1979.

Sherwin J. Maklin, of Maklin & Gottlieb, of Chicago, for appellant.

Frank R. Krok, of McBride, Baker, Weinke & Schlosser, of Chicago, for appellee.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Go-Tane Service Stations, Inc., brought this action against defendant, Bank of Westmont, claiming defendant wrongfully refused to pay certain checks written by defendant, James D. Sharp, on his account at the Bank of Westmont. The trial court granted summary judgment in favor of the defendant bank and plaintiff appeals.

On October 28, 1972, Sharp became employed by Go-Tane as the manager of its Ogden Avenue gasoline station. On March 30, 1973, he opened a joint account with his wife at the Bank of Westmont under the name "Sharp Go-Tane Service." At the time the account was opened, Sharp signed a sworn statement which stated that he was the owner of the Ogden Avenue Go-Tane station. Actually he was only the manager and as manager was to deliver the day's proceeds from the sale of plaintiff's products to a bonded messenger. The messenger would then deliver the proceeds to plaintiff's bank, Midwest Bank and Trust Company of Elmwood Park, for deposit in plaintiff's account. Instead of following this procedure, Sharp deposited the cash proceeds in his own account at the Bank of Westmont and then gave the messenger a check drawn on that account. This procedure was apparently followed for over two years.

On May 29, 1975, Sharp was fired by Go-Tane after an investigation which allegedly disclosed that Sharp was cheating his customers. That same day, sometime between 10 and 11 a.m., Sharp went to the Bank of Westmont and spoke with Craig Grember, the assistant cashier. He told Mr. Grember that he wanted to stop payment on all checks drawn by him on his Go-Tane account, specifically any checks to plaintiff. Only checks signed by Sharp's wife were to be honored. The bank complied and stopped payment on 10 checks totalling over $15,000. The following day, May 30, 1975, Sharp and his wife withdrew the balance of the account, $9,526.10 which was paid to them in cash. At that time, Sharp used $246.80 of the funds to pay off an outstanding loan from the bank. Sharp and his wife have since left the jurisdiction and have not been located and have not been served with summons in this case.

Plaintiff subsequently brought this action in three counts against Sharp and the Bank of Westmont. Count I against Sharp for conversion of the funds is not involved in this appeal. Count II charges the Bank of Westmont with wrongful refusal to pay on the checks, drawn by Sharp and payable to the plaintiff, and count III charges the bank with conversion of the funds. On December 8, 1978, the trial court entered summary judgment for defendant with respect to counts II and III and

made the specific finding that there was no just reason to delay enforcement or appeal. Plaintiff filed a timely notice of appeal.

The central question in this appeal is whether the trial court properly granted summary judgment with respect to counts II and III. Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1977, ch. 110, par. 57(3).) In ruling on a motion for summary judgment, the trial court must construe the evidence strictly against the moving party. *Armagast v. Medici Gallery & Coffee House, Inc.* (1977), 47 Ill. App. 3d 892, 365 N.E.2d 446.

Plaintiff first contends that the bank is liable with respect to three of the checks because it had made final payment before the customer ordered the stop payment. Under section 4—213 of the Commercial Code, "An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first: * * * (c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; * * *." (Ill. Rev. Stat. 1977, ch. 26, par. 4—213(1).) The process of posting is complete when one or more of the following steps, as determined by the bank, are completed: "(a) verification of any signature; (b) ascertaining that sufficient funds are available; (c) affixing a 'paid' or other stamp; (d) entering a charge or entry to a customer's account; (e) correcting or reversing an entry or erroneous action with respect to the item." (Ill. Rev. Stat. 1977, ch. 26, par. 4—109.) The process is intended to be "the usual procedure followed by a payor bank in determining to pay an item and in recording the payment * * *." Ill. Rev. Stat. 1977, ch. 26, par. 4—109.

The bank employees testified that under their usual procedure, checks were first processed at their computer center which posted the checks to the customer's accounts. The checks were then brought to the bank where the bookkeeping department sorts the checks by account number and makes a special examination of items exceeding $1,000. The checks are then put through a machine which photographs the front and back and stamps the checks "paid." The checks are then returned to the bookkeeping department where they are ready to be filed. When the checks are placed in the customer file, the signature is verified against the customer's card. The bookkeeping department usually begins the filing process in midafternoon and it is sometimes not completed until the next day.

With regard to the three checks in this case, Mr. Grember testified that Sharp came into the bank sometime between 10 and 11 a.m. on May 29 to order the stop payment. Mr. Grember called the bookkeeping

department and a clerk pulled the three checks and brought them to Mr. Sharp. The checks had been stamped "paid" but the clerk could not remember whether or not they had been filed. Plaintiff argues that this creates a triable issue with respect to whether the checks had in fact been filed.

Although the customer's stop order was given in the morning, prior to the bank's usual filing time, it is a question of fact whether the checks had been filed and whether the signature check had been completed. Since the clerk could not specifically remember the location of the checks, the trier of fact would have to consider this inability to remember and the rest of the facts of the case and make a determination as to whether the signature check had or had not yet been performed, whether the process of posting had been completed or not, and thus whether the bank had made final payment.

Plaintiff next contends that the bank failed to return the checks prior to the midnight deadline. Under section 4—302, a payor bank is accountable for the amount of a check if it does not pay or return the item of send notice of dishonor until after its midnight deadline. (Ill. Rev. Stat. 1977, ch. 26, par. 4—302(a).) Similarly, under section 4—301(1), the payor bank may revoke the settlement of an item and recover payment if it does so before it has made final payment, and if before its midnight deadline it returns the item or sends written notice of dishonor if the item is unavailable for return. (Ill. Rev. Stat. 1977, ch. 26, par. 4—301(1).) The testimony indicated that the checks were received at the bank's computer center on May 27, 1975, where they were posted to the customer's account. The following day was a bank holiday so the checks were received at the bank on the morning of May 29. When Sharp arrived between 10 and 11 that morning and requested that payment be stopped, the items were pulled from the bookkeeping department and brought to Sharp for visual verification. Mr. Grember then directed the bookkeeping supervisor to stop payment and return the items. The bookkeeping supervisor testified that their standard procedure was to return the items the same day that the stop payment order was received. Included in the record was a letter dated May 29, 1975, addressed to the Federal Reserve Bank which listed the three checks in issue in this litigation. This letter was the standard form attached to items which are returned to the Federal Reserve.

■■■ Where the payee seeks to hold the payor bank accountable on an item, the payee has the burden of proving that the bank has failed to meet its midnight deadline. (*Conn v. Bank of Clarendon Hills* (1972), 53 Ill. 2d 33, 36, 289 N.E.2d 425, 427.) Since the midnight deadline begins to run from the time the check is received at the bank's computer center (*Farmers & Merchants Bank v. Bank of America* (1971), 20 Cal. App. 3d

939, 98 Cal. Rptr. 381), the bank in this case was obligated to return the checks by midnight on May 29. The bank employees' testimony as to their standard procedure, coupled with the date on the cover letter to the Federal Reserve, is sufficient to show that the items were returned on May 29. This conclusion will, of course, be subject to any contrary evidence produced at trial on remand.

■■ In response, plaintiff presents the counteraffidavit of Robert Woods, the president of Midwest Bank and Trust Company. The affidavit states that Mr. Woods has been engaged in the banking business for approximately 25 years and after examining the markings on the front and back of the checks, he concluded that the checks were not returned prior to the midnight deadline. The trial court granted defendant's motion to strike the affidavit on the ground that it failed to comply with Supreme Court Rule 191 (Ill. Rev. Stat. 1977, ch. 110A, par. 191). Under Rule 191, the affidavit must set forth with particularity the facts upon which the claim is based and must show that the affiant, if sworn as a witness, would be competent to testify to the matter. (Ill. Rev. Stat. 1977, ch. 110A, par. 191(a).) Since in this case the affidavit asserts an opinion, it must first qualify as expert testimony. Although Mr. Woods' 25 years experience in the banking industry might indicate that he is qualified to express an opinion in regard to the markings on the backs of the checks, his failure to state specific facts which formed the basis of his conclusion renders his affidavit deficient. The backs of the checks show cancellation marks bearing dates after May 29, the day on which the midnight deadline fell. Although the affidavit was properly stricken, we believe that the markings which appear on the backs of the checks may themselves provide evidence to counter defendant's evidence that the midnight deadline was met, even absent expert testimony. It will be the function of the finder of fact at trial to determine whether the stamps on the checks provide an indication as to whether or not the midnight deadline was met.

■■ Under count III, plaintiff claims that defendant bank is liable on the checks under a conversion theory. In response, the bank claims that the fiduciaries act (Ill. Rev. Stat. 1977, ch. 98, par. 234 *et seq.*) provides it with a valid defense. The fiduciaries act applies to situations where a party deals with another whom he knows to be a fiduciary. (Uniform Fiduciaries Act, Commissioner's Prefatory Note, 7A Unif. Laws Annot. (1978).) The purpose of the Act is to facilitate the fiduciary's performance of his responsibilities by limiting the liability of those who deal with him. (Uniform Fiduciaries Act, Commissioner's Prefatory Note, 7A Unif. Laws Annot. 128 (1978).) In general, the Act places on the principal the burden of employing honest fiduciaries. *Johnson v. Citizens National Bank* (1975), 30 Ill. App. 3d 1066, 334 N.E.2d 295.

■■ The fiduciaries act relieves the bank of liability to the principal unless

the bank has actual knowledge that the fiduciary is committing a breach of his obligation or the bank has knowledge of facts that its action in paying the check amounts to bad faith. (Ill. Rev. Stat. 1977, ch. 98, pars. 240 and 242.) Where the fiduciary uses fiduciary funds for the payment of a personal debt to the bank by a check drawn on that account, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation. (Ill. Rev. Stat. 1977, ch. 98, par. 240.) However, the bank's liability to the principal necessarily depends upon the bank's knowledge of the fiduciary relationship. Where the bank has no actual or bad faith knowledge of the fiduciary relationship, there can be no basis for imposing liability on the principal.

In this case, Sharp opened his account in the name "Sharp Go-Tane Service." When he opened the account, he signed a sworn statement that he was the sole owner of the service station. Since plaintiff admits that service stations are sometimes owner-operated, the name of the account was not sufficient to indicate a fiduciary relationship to plaintiff. Similarly, the mere fact that Sharp's daughter-in-law was a bank employee is insufficient to show that the bank knew that Sharp was plaintiff's employee. The daughter-in-law worked in an entirely separate department, and there was no indication that she discussed her father-in-law's business affairs with the bank employees. We also do not find persuasive plaintiff's argument that Sharp's employment status, which was indicated on his loan application, was sufficient to impute knowledge of the fiduciary relationship. Again, the information was held by a separate department. There is no reason the checking department should not rely on its own information to the contrary.

We conclude that the facts fail to show the bank's actual or bad-faith knowledge of the fiduciary relationship and therefore the bank is not liable under count III to plaintiff in conversion for its dealings with Sharp.

We therefore affirm the trial court's order granting summary judgment to defendant as to count III, we reverse as to count II and we remand for further proceedings.

Affirmed in part, reversed in part and remanded.

NASH and LINDBERG, JJ., concur.