MICHALINE MIKRUT *et al.*, as Co-Ex'rs of the Estate of Theodore Kasprzycki, Deceased, Plaintiffs-Appellants, v. FIRST BANK OF OAK PARK, Defendant-Appellee.

First District (1st Division) No. 1—03—3394

Opinion filed June 30, 2005.

38

David E. Neumeister, Thomas C. Kaufman, and Karen M. Vivian, all of Querry & Harrow, Ltd., of Chicago, for appellants.

Matthew S. Klepper and Hugh S. Balsam, both of Lord, Bissell & Brook, L.L.P., of Chicago, for appellee.

JUSTICE McBRIDE delivered the opinion of the court:

Plaintiffs-appellants, Michaline Mikrut and Theresa Mudjer, in their capacity as co-executors of the estate of their deceased brother, Theodore Kasprzycki, sued the defendant-appellee, First Bank of Oak Park (First Bank). The action sought to recover estate funds that were converted by plaintiffs' attorney, Anthony Capetta. Capetta, in his capacity as plaintiffs' fiduciary, received three checks which represented the proceeds of Kasprzycki's estate. Plaintiffs claimed that Capetta, without plaintiffs' authority, improperly endorsed these checks, deposited them into his client trust account (escrow account) with First Bank, and converted those funds for his own use. Count I of plaintiffs' amended complaint alleged conversion under section 3—420 of the Uniform Commercial Code (UCC) (810 ILCS 5/3—420 (West 2000)). Count II alleged a "claim of interest" under sections 3—306 and 3—307 of the UCC (810 ILCS 5/3—306, 3—307 (West 2000)). First Bank moved for summary judgment on each count arguing,

among other things, that under the Fiduciary Obligations Act (760 ILCS 65/7 (West 2000)), First Bank was relieved of liability because it did not act in bad faith or with knowledge that Capetta breached his fiduciary duties to plaintiffs. First Bank's summary judgment motion was ultimately granted by the trial court. Plaintiffs then filed a motion to reconsider, which the trial court denied. Plaintiffs appeal from the orders entered by the trial court.

Plaintiffs alleged in their amended complaint that Anthony Capetta was an attorney and was representing plaintiffs as co-executors of their deceased brother's estate in 1996. The estate was the subject of a probate action filed in the circuit court of Cook County. Capetta continued to represent plaintiffs until he died on January 27, 1997. Prior to his death, Capetta maintained a client trust account, which the parties refer to as an "escrow account," with First Bank. Plaintiffs alleged that Capetta, as agent for plaintiffs, "had delivered to him" three checks representing the proceeds of the sale of certain estate assets. These assets consisted primarily of the decedent's real estate and common stock in a variety of corporations.

Theresa Mudjer explained in her deposition that Capetta "suggested" the checks at issue be put into his safe after the estate closing. According to Mudjer, the rationale for leaving the checks in Capetta's safe was that they could not be cashed until after probate, a period of six months. Mudjer and her sister agreed that the checks could be kept in Capetta's safe.

The first of these three checks was drawn on American National Bank, as check number 3105812 dated June 16, 1996, and was made payable to "Theresa M. Mudjer & Michaline Mikrut Independent Executors of the Theodore Michael Kaspyrzycki Estate" in the amount of $93,224.42. The second check was drawn on Citibank, as check number 013147084, dated July 10, 1996, and was made payable to "Mrs Therese M Kudjer, Mrs Michaline Mikrut Co-Execs, Est Theodore Michael Kasprzycki C/O A.B. Capetta" in the amount of $486,678.63. The third check was drawn on Harris Trust and Savings Bank, as check number 013147084, dated July 26, 1996, and was made payable to "Michaline Mikrut & Theresa M Mudjer Ind Co-Ex C/O Anthony B Capetta Atty at Law" in the amount of $129,373.22.

While the endorsements on the reverse side of the first and third checks in the record before us are illegible, the endorsement on the back side of the second check states: "Pay To The Order of Anthony B. Capetta Escrow Acct," with the apparent signatures of "Mrs. Theresa M. Mudjer" and Mrs Michalene Mikrut" as "Co-Execs Est. Theodore Michael Kasprzycki."

Plaintiffs alleged that Capetta was not authorized to endorse any

of these checks and First Bank was never advised that Capetta was authorized to endorse these checks. Mudjer also testified in her deposition that she did not talk to Capetta about the idea of cashing the checks. She said she understood that her endorsement would be required to negotiate the checks at issue. Michaline Mikrut testified that she understood there was no way to negotiate the checks without her endorsement and her sister's endorsement.

Plaintiffs further alleged that without their authorization Capetta improperly forged plaintiffs' endorsements on the three checks and deposited them into his escrow account at First Bank. Capetta then allegedly spent the plaintiffs' funds for his personal benefit. Plaintiffs did not know of Capetta's fraud, specifically that he deposited these checks into the escrow account without the plaintiffs' authorization, until after Capetta died. They also discovered that Capetta had misappropriated funds from many of his clients by making payments from the escrow account for his personal use.

Prior to Capetta's death and plaintiffs' discovery of the forged endorsements, Capetta provided a "Final Account" for the estate on November 29, 1996. He sent this document to Joseph Mikrut, the son of Michaline Mikrut, who was assisting the plaintiffs in preparing the estate's tax forms. The Final Account included the combined value of the three checks on which Capetta allegedly forged his endorsements.

The record shows that Capetta had been a customer at First Bank for many years. Capetta maintained three personal accounts with First Bank in addition to the escrow account. On December 9, 1985, Capetta and his wife obtained a mortgage, secured by their real property, in the amount of $310,000. In connection with the mortgage loan, Capetta and his wife executed a "Pledge to Secure Guaranty and Other Liabilities" with First Bank. That document stated the following in pertinent part:

"Upon non-payment when due of any of the Obligations, or upon any failure of the undersigned or any of them, to perform under this Agreement,

* * *

(3) any indebtedness owing from the Bank to the Undersigned and any deposits of the Undersigned in the possession or control of the Bank for any purpose may at any time without notice be applied on any or all of the Obligations."

This mortgage loan was modified several times. The final modification occurred in 1996, and the Capettas' adjusted net worth was calculated at $1.16 million.

Capetta provided legal services for three principals at First Bank prior to his death. Specifically, Capetta wrote a will for the in-laws of

Frank Prucha, a vice president at First Bank and set up a trust for the disabled aunt of Prucha's wife. Capetta also assisted Thomas Dwyer, another First Bank vice president, in purchasing a home in 1992, Capetta drafted a will for Dwyer and his wife, he helped Dwyer's sister-in-law purchase a condominium, and he prepared income tax returns in 1994 for an in-law of Dwyer. In addition, Capetta assisted Mike Kelly, First Bank's president, with the purchase of three real estate properties.

As indicated above, plaintiffs sued First Bank shortly after Capetta died. Count I of plaintiffs' amended complaint alleged a conversion claim against First Bank for the forged checks under section 3—420 of the UCC. Count II alleged a "claim of interest" in the checks under sections 3—306 and 3—307 of the UCC. First Bank moved for summary judgment on both counts. With regard to count I, First Bank argued that section 7 of the Fiduciary Obligations Act (760 ILCS 65/7 (West 2000)), discussed below, provided it with a complete defense to any liability based on the malfeasance of Capetta because the bank acted in good faith and without actual knowledge of Capetta's breach of his fiduciary duties to plaintiffs. It further asserted that because Joseph Mikrut, who was plaintiffs' agent, knew that the checks had been negotiated before Capetta's death, plaintiffs had ratified the deposit of the checks into Capetta's escrow account. As to count II, First Bank argued plaintiffs failed to provide any evidence showing that First Bank had "notice of a breach of fiduciary duty" as required under section 3—307 of the UCC set forth below.

The trial court, in an order dated December 13, 2002, stated the following, in relevant part:

"1. Defendant's Motion for Summary Judgment is granted and judgment is entered against Plaintiffs as to their entire Complaint, except to the extent that Plaintiffs can show payments, involving all or part of the funds represented by Plaintiffs' checks delivered to Capetta, falling within the circumstances described in the second sentence of 760 ILCS 65/7 or the circumstances described in 810 ILCS 5/3—307(b)(4). If Plaintiffs contend that such payments were made, Plaintiffs shall identify such payments in a writing filed with the Court and served on Defendant's counsel no later than December 31, 2002.

2. With respect to Defendant's Motion for Summary Judgment argument based on ratification, the court declines to enter summary judgment on this ground because it finds there is a triable issue of fact."

On December 31, 2002, plaintiffs asked the trial court to reconsider the summary judgment order entered in favor of First Bank. With

regard to count I, plaintiffs argued that section 3—420 of the UCC superceded section 7 of the Fiduciary Obligations Act. Plaintiffs also argued, in the alternative, that section 9 of the Fiduciary Obligations Act should apply instead of section 7 and that the section 9 defense to liability was not available to First Bank under these facts. Concerning count II, plaintiffs argued that First Bank's knowledge of Capetta's finances and the past relationship between Capetta and several First Bank officers raised a fact question as to whether First Bank had notice of Capetta's breach of fiduciary duty under section 3—307 of the UCC.

Plaintiffs attached to their motion to reconsider 10 checks made payable to First Bank and drawn on Capetta's escrow account in the amounts of: $72,949.68, $107,478.68, $62,000, $5,000, $5,000, $10,000, $5,000, $20,000, $21,000, and $60,000, respectively. In its response to plaintiffs' motion to reconsider, First Bank noted the first three of these checks predated or were "written out" of the escrow account before Capetta deposited the first of the checks belonging to the plaintiffs. With regard to the seven remaining checks, First Bank established that these checks were made payable to First Bank so that Capetta could purchase seven cashiers' checks that were made payable to third parties. Plaintiffs also attached to their motion to reconsider 12 checks that were drawn off accounts other than the escrow account. First Bank responded by claiming that because these checks were not drawn from the escrow account at issue, they could not possibly consist of any of the funds represented by plaintiffs' checks that were delivered to Capetta.

The trial court denied plaintiffs' motion for reconsideration on October 14, 2003. With regard to count I, the trial court found that section 7 of the Fiduciary Obligations Act applied and absolved First Bank from liability. With regard to count II, the court determined that plaintiffs did not make a factual showing that section 3—307(b)(4) of the UCC applied. Specifically, it found the evidence did not show any checks taken by First Bank in payment of or as security for a debt known by First Bank to be the personal debt of Capetta. Plaintiffs appeal.

We first consider whether the trial court properly granted summary judgment in favor of First Bank with respect to the conversion claim (count I). The granting of summary judgment by the trial court is subject to *de novo* review. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 821 N.E.2d 206 (2004). The relevant statutory provisions that concern count I are as follows.

■ Section 3—420 of the UCC provides, in relevant part:
"Conversion of instrument.

(a) The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee." 810 ILCS 5/3—420(a) (West 2000).

■ Section 7 of the Fiduciary Obligations Act states:

"If a deposit is made in a bank to the credit of a fiduciary as such, the bank is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with the actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith. If, however, such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check." 760 ILCS 65/7 (West 2000).

■ Section 9 of the Fiduciary Obligations Act states:

"Notwithstanding any other law, if a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and indorsed by him, if he is empowered to indorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith." 760 ILCS 65/9 (West 2000).

■ As a preliminary matter, we consider plaintiffs' first argument that section 9 of the Fiduciary Obligations Act is applicable here.

Plaintiffs argue that the language of section 9 "would at least potentially apply to a case involving a bank taking a check with a forged endorsement." Specifically, they contend the key language in section 9 that makes it applicable is, "if a fiduciary makes a deposit in a bank *** of checks payable to his principal and indorsed by him, if he is empowered to indorse such checks ***, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary." 760 ILCS 65/9 (West 2000). According to plaintiffs, this language, as opposed to section 7 of the Fiduciary Obligations Act, addresses the situation here and relieves the bank of liability only if the fiduciary was "empowered to indorse such checks." 760 ILCS 65/9 (West 2000). According to plaintiffs, since Capetta was not empowered to indorse the checks at issue, section 9 does not relieve First Bank of liability and therefore under section 3—420 of the UCC First Bank would be liable for the conversion.

We reject plaintiffs' argument with regard to the applicability of section 9 because Capetta did not make a deposit in a bank "to his personal credit." 760 ILCS 65/9 (West 2000). Section 9 comes into play when a fiduciary makes a deposit to his personal account. *County of Macon v. Edgcomb*, 274 Ill. App. 3d 432, 436-37, 654 N.E.2d 598 (1995). In this case, it is undisputed that Capetta deposited the checks at issue into his escrow account, not into his personal account. Thus, section 9 of the Fiduciary Obligations Act does not apply.

■ Plaintiffs next argue that section 3—420 of the UCC applies because the allegations in their amended complaint implicate a conversion claim. They further allege that section 3—420, by its plain terms, applies to instruments taken from a person not entitled to enforce the instrument or receive payment. 810 ILCS 5/3—420 (West 2000). According to plaintiffs section 7 of the Fiduciary Obligations Act applies only to the fiduciary's drawing of a check and, because the checks at issue were not drawn by Capetta, their conversion claim can stand. Apart from their own interpretation of section 7, however, plaintiffs offer no authority supporting such a construction. Plaintiffs further contend that section 3—420 of the UCC "supercedes" section 7 of the Fiduciary Obligations Act in this case. First Bank responds that section 7 of the Fiduciary Obligations Act applies and it is not liable for plaintiffs' loss, which resulted from Capetta's malfeasance, because First Bank did not act in bad faith or with actual knowledge of Capetta's breach of his fiduciary obligations to plaintiffs.

We also reject plaintiffs' claim that section 7 is limited to situations involving checks drawn by a fiduciary. The first words of section 7 state: "If a deposit is made in a bank to the credit of a fiduciary as

such, the bank is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary ***." 760 ILCS 65/7 (West 2000). This section further provides that a bank is not liable for paying the amount of the deposit, "unless the bank pays the check with the actual knowledge that the fiduciary is committing a breach of his obligation as the fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith." 760 ILCS 65/7 (West 2000). Based on the language of section 7, we read it to include a bank's actions in paying checks that are deposited by a fiduciary as well as paying on checks drawn by a fiduciary.

Further, as set forth in *Edgcomb*, the Fiduciary Obligations Act applies where a fiduciary endorses an instrument made payable to the principal or to the fiduciary in his fiduciary capacity, or where the fiduciary draws checks in his fiduciary capacity. *Edgcomb*, 274 Ill. App. 3d at 435, citing 760 ILCS 65/4, 5 (West 1992). Moreover, the payor bank is protected under section 7 when it pays the amount of the deposit if the fiduciary's check is " 'signed with the name in which such deposit is entered.' " *Edgcomb*, 274 Ill. App. 3d at 436, quoting 760 ILCS 65/7 (West 1992). Therefore, the language of section 7 indicates that it applies to the actions of depositing and paying as well as to drawing. Where statutory language is clear and unambiguous, a court must give it effect. *USX Corp. v. White*, 352 Ill. App. 3d 709, 720, 817 N.E.2d 896 (2004).

Plaintiffs alternatively argue that in the event section 7 of the Fiduciary Obligations Act applies, they have presented sufficient evidence to overcome First Bank's summary judgment motion. Specifically, plaintiffs contend the evidence establishes factual questions as to whether First Bank had knowledge of Capetta's "misdeeds" and whether First Bank knew that Capetta was acting in breach of his fiduciary duties.

The Uniform Fiduciaries Act was approved by the National Conference of Commissioners on Uniform State Laws and the American Bar Association in 1922 and was enacted in Illinois in 1931. In Illinois, it is entitled the Fiduciary Obligations Act. *Edgcomb*, 274 Ill. App. 3d at 435. The purpose of the Fiduciary Obligations Act is to protect depository banks, specifically:

"[t]o cover situations which arise when one person honestly deals with another knowing him to be a fiduciary. The Act ' "relaxes some of the harsher rules which require of a bank *** the highest degree of vigilance in the detection of a fiduciary's wrongdoing." ' [Citation.]

\* \* \*

The Act relieves the depository bank of the duty of seeing that

funds are properly applied. It becomes the principal's burden to employ honest fiduciaries. [Citation.]" *Johnson v. Citizens National Bank of Decatur*, 30 Ill. App. 3d 1066, 1069-70, 334 N.E.2d 295 (1975), quoting *National Casualty Co. v. Caswell & Co.*, 317 Ill. App. 66, 72 (1942).

The Fiduciary Obligations Act also:

"[R]elieves the bank of liability to the principal unless the bank has actual knowledge that the fiduciary is committing a breach of his obligation or the bank has knowledge of facts that its action in paying the check amounts to bad faith. [Citation.] Where the fiduciary uses fiduciary funds for the payment of a personal debt to the bank by a check drawn on that account, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation. [Citation.]" *Go-Tane Service Stations, Inc. v. Sharp*, 78 Ill. App. 3d 785, 789-90, 397 N.E.2d 249 (1979).

See also *Hosselton v. First American Bank N.A.*, 240 Ill. App. 3d 903, 907-08, 608 N.E.2d 630 (1993), and *Bellflower Ag Service, Inc. v. First National Bank & Trust Co. in Gibson City*, 130 Ill. App. 3d 80, 86, 473 N.E.2d 998 (1985) (which state the purpose of the Fiduciary Obligations Act identified above).

■ The decisions cited above hold that under section 7 of the Fiduciary Obligations Act, a bank that deals with a fiduciary is not liable to the principal for a fiduciary's breach unless the bank acts in bad faith or has actual knowledge that the fiduciary's conduct is in breach of his obligations to the principal. *Edgcomb*, 274 Ill. App. 3d at 436. Section 7, however, also provides that a drawee bank is liable if a fiduciary delivers a check made payable to it "in payment of or as security for a personal debt," and "if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check." 760 ILCS 65/7 (West 2000). Under this latter provision, plaintiffs must show that Capetta drew checks on the client escrow account in payment of or as security for a personal debt Capetta owed to First Bank.

■ Plaintiffs argue they have raised questions of fact as to whether First Bank acted in bad faith, had actual knowledge with regard to Capetta's breach of a fiduciary duty to them, and took checks from Capetta in payment of or as security for a debt known by First Bank to be a personal debt of Capetta. We disagree. Although Capetta was a fiduciary and deposited funds into the escrow account, there is no evidence in the record that shows First Bank acted in bad faith or with actual knowledge of Capetta's breach of his fiduciary obligations to plaintiffs, or that First Bank took checks from Capetta in payment of or as security for a debt known by First Bank to be a personal debt of Capetta.

An example of bad faith is where the bank "suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that [it] may avoid knowledge that the fiduciary is acting improperly." *Edgcomb*, 274 Ill. App. 3d at 436. Plaintiffs claim questions of fact exist with regard to First Bank's bad faith because of First Bank's knowledge of Capetta's personal financial information and because Capetta provided legal services for high-ranking First Bank officers. Plaintiffs add that because First Bank had access to all of Capetta's financial information, it could have discovered that Capetta's personal expenditures greatly exceeded his income. According to plaintiffs, a trier of fact could infer that First Bank had sufficient knowledge of the fraudulent nature of the subject transactions to impose liability under section 7 of the Fiduciary Obligations Act.

Establishing bad faith, however, requires evidence that First Bank suspected Capetta was acting improperly and deliberately refrained from investigating so that First Bank could avoid knowledge that Capetta was acting improperly. *Edgcomb*, 274 Ill. App. 3d at 436. Here, plaintiffs have not presented any evidence that First Bank suspected Capetta was acting improperly as a fiduciary. Instead, the evidence shows that Capetta, who was plaintiffs' designated fiduciary for administering the estate matters, deposited the checks at issue into his client escrow account. As noted by the trial court, Capetta's "deposits[ ] to a clearly identified fiduciary account were not *per se* alarming." As further observed by First Bank, under the protection afforded by the Fiduciary Obligations Act, there was no duty for it to investigate this "outwardly proper" transaction. Moreover, even if the suspicion of Capetta's fiduciary impropriety did exist, plaintiffs provided no evidence indicating that First Bank deliberately refrained from investigating. Thus, First Bank did not accept the checks at issue in bad faith.

Plaintiffs have also failed to provide evidence that First Bank had actual knowledge that Capetta was breaching any fiduciary duty in depositing the checks at issue. A depository bank that deals with a fiduciary is not liable unless it had "actual knowledge the conduct constitute[d] a breach of a fiduciary obligation." *Edgcomb*, 274 Ill. App. 3d at 436. The bank being on notice "of the existence of the fiduciary relationship is not enough to raise a duty of inquiry." *Edgcomb*, 274 Ill. App. 3d at 436. *Edgcomb* also establishes that the knowledge of an organization is determined by the knowledge of the individual who conducts the transaction. *Edgcomb*, 274 Ill. App. 3d at 439.

Plaintiffs rely on the same facts set forth above to support their argument that First Bank had actual knowledge that Capetta breached

a fiduciary obligation to them. Here, the record, at best, indicates that First Bank was on notice that Capetta was plaintiffs' fiduciary. However, there is no evidence suggesting that First Bank had actual knowledge that Capetta's acts of depositing the checks into the client escrow account were a breach of his fiduciary obligation. Specifically, plaintiffs have failed to provide any evidence that the individual or individuals at First Bank who conducted the transaction and accepted the checks at issue had any such knowledge. As a result, plaintiffs have not established that First Bank had actual notice that Capetta was breaching any fiduciary duty in paying the checks at issue. *Edgcomb*, 274 Ill. App. 3d at 436.

Finally, with regard to the latter provision set forth in section 7, plaintiffs argue that they have presented sufficient evidence to create a question of fact as to whether First Bank took an instrument from Capetta knowing that the instrument was in payment of or as security for one of Capetta's debts. They claim to have established this by evidence of Capetta's long-standing account activity at First Bank and documentation which showed First Bank's knowledge of Capetta's fiduciary status "by virtue of his escrow account." Plaintiffs further contend that Capetta secured his mortgage debt to First Bank with his other accounts there. Specifically, they assert that Capetta's escrow account served as collateral for the mortgage on Capetta's home. Finally, plaintiffs argue that the subject checks were used as payment for Capetta's personal debts and that they provided evidence of checks drawn on the escrow account and made payable to First Bank in their motion to reconsider.

Again, at best, plaintiffs' evidence establishes that First Bank knew of Capetta's fiduciary status. However, plaintiffs provide no evidence that First Bank took an instrument from Capetta knowing that the instrument was in payment of or as security for one of Capetta's debts owed to First Bank.

As additional support for their claim that Capetta secured his mortgage debt to First Bank with his other bank accounts, plaintiffs refer us generally to a 66-page citation to the record. Citing to 66 pages in the record without identifying the specific documentary evidence relied upon is not a relevant citation supporting plaintiffs' claim. Failure to provide relevant citations to the record is a violation of Supreme Court Rule 341(e)(7) and results in a waiver. See *McGovern v. Kaneshiro*, 337 Ill. App. 3d 24, 38, 785 N.E.2d 108 (2003); 188 Ill. 2d R. 341(e)(7). This court "is not a depository in which an appellant may dump its arguments without factual foundation in hopes that [the court] will sift through the entire record to find support for a determination favorable to appellant's position." *Coffey v. Hancock*,

122 Ill. App. 3d 442, 444, 461 N.E.2d 64 (1984). We will not sift through 66 pages in the record to find some support for this contention. Therefore, we find this claim is waived.

■ Plaintiffs also argue that the "Pledge to Secure Guaranty and Other Liabilities" made in connection with Capetta's original mortgage suggests that any indebtedness owed to First Bank by Capetta could be satisfied by the Bank's entitlement to take any of Capetta's deposits that were in control of the bank. However, we do not read this language to suggest that payment for any of Capetta's indebtedness, including the mortgage debt, could be taken by First Bank from the escrow account at issue here. Thus, plaintiffs' claim that the escrow account served as collateral for the mortgage on Capetta's home is again unsubstantiated by any documentation in the record and is therefore waived.

■ With regard to the 10 checks attached to plaintiffs' motion to reconsider that were drawn on Capetta's escrow account and made payable to First Bank, three of the checks were "written out" of the escrow account before plaintiffs' checks were deposited and the remaining seven were made payable to First Bank so that Capetta could purchase cashiers' checks made payable to third parties. Thus, there is no evidence that First Bank took these checks in payment of or as security for a debt known by First Bank to be a personal debt of Capetta owed to First Bank.

Two Illinois cases support the summary judgment order entered in favor of First Bank. *Go-Tane*, 78 Ill. App. 3d at 790, and *Edgcomb*, 274 Ill. App. 3d 432, 654 N.E.2d 598.

In *Go-Tane*, the plaintiff, a service station company, brought an action against the defendant bank, where the plaintiff's employee maintained an account. The employee was the manager at the plaintiff's Odgen Avenue gasoline station. The employee opened up an account with the defendant bank under the name of "Sharp Go-Tane Service." At the time he opened up the account, the employee signed a sworn statement that he was the owner of the Ogden Avenue station. In fact, the employee was only the manager and his duties were to deliver the day's proceeds from the sale of the plaintiff's products to a bonded messenger for placement into the plaintiff's account. However, the employee, instead of following this procedure, deposited the cash proceeds into his own account at the defendant bank and then issued a check to the messenger drawn on his account.

This conduct occurred for over two years until the employee was fired. On the day he was fired, the employee stopped payment on all checks drawn by him on his accounts, specifically any checks to the plaintiff. The bank complied and stopped payment on 10 checks, which

amounted to over $15,000 of the plaintiff's funds that were embezzled by the employee. The employee then withdrew the balance of the account on the next day and fled the jurisdiction.

The plaintiff sued the defendant bank for, among other things, conversion of the funds. The trial court rejected this claim and granted summary judgment in the bank's favor. The question on appeal was whether the trial court properly entered summary judgment in favor of the bank. On review, the appellate court affirmed the trial court's summary judgment in the favor of the bank with regard to the conversion claim. *Go-Tane*, 78 Ill. App. 3d at 790. It did so because the facts failed to show the bank's "actual or bad faith knowledge" that the fiduciary breached a fiduciary obligation and therefore the bank was not liable for conversion under the Fiduciary Obligations Act. *Go-Tane*, 78 Ill. App. 3d at 790.

As in *Go-Tane*, there are no facts in the instant case showing First Bank acted in bad faith, had actual knowledge that Capetta breached his fiduciary obligations to the plaintiffs, or took checks in payment of or as security for a debt known by First Bank to be a personal debt of Capetta. Absent evidence triggering any of the provisions set forth in section 7 of the Fiduciary Obligations Act, *Go-Tane* supports the finding that First Bank is absolved from liability for conversion here.

*Edgcomb*, cited above, also supports First Bank's position. In *Edgcomb*, the plaintiff county sued its former treasurer, who was a fiduciary, and two defendant banks to recover over $400,000 that was allegedly embezzled by the former treasurer. The trial court dismissed all 11 counts against the banks and the county appealed.

Addressing the one count relevant here, the plaintiff alleged that a certain check in the amount of $3,132.49 was drawn by the former treasurer on the plaintiff's tax protest account at the defendant bank and the bank paid this check, which was used as payment on a commercial loan held by the treasurer. The plaintiff further claimed that the defendant bank had actual knowledge of the former treasurer's breach of his fiduciary obligations and acted in bad faith in paying this check. The appellate court found that the trial court's dismissal of this count was proper with regard to liability of the defendant bank as payor of the check under section 7 of the Fiduciary Obligations Act since the bank had no "actual knowledge of a breach of fiduciary obligation or bad faith." *Edgcomb*, 274 Ill. App. 3d at 438. The *Edgcomb* court further explained that the Fiduciary Obligations Act is "meant to limit liability 'to relatively uncommon cases in which the person who deals with the fiduciary knows all the relevant facts.' [Citation.] " *Edgcomb*, 274 Ill. App. 3d at 438. The appellate court affirmed the dismissal of 10 counts the plaintiffs pled against the banks,

but allowed one to stand because it stated a cause of action under section 5 of the Fiduciary Obligations Act, which is not pertinent here.

As discussed above, the record does not show that First Bank exhibited bad faith, had actual knowledge of a breach of fiduciary obligation, or took checks in payment of or as security for a debt known by First Bank to be a personal debt of Capetta.

Nonetheless, plaintiffs argue the law is clear that fiduciary authority to endorse settlement checks, even when an attorney is involved in settling a judgment, must be specifically granted and banks can be liable under a conversion theory for accepting forged checks. However, the primary cases that plaintiffs rely upon, *Crahe v. Mercantile Trust & Savings Bank*, 295 Ill. 375, 378-79, 129 N.E.120 (1920), *Kallison v. Harris Trust & Savings Bank*, 338 Ill. App. 33, 86 N.E.2d 858 (1949), *Bellflower*, 130 Ill. App. 3d 80, and *Leeds v. Chase Manhattan Bank, N.A.*, 331 N.J. Super. 416, 752 A.2d 332 (2000), are distinguishable.

Although *Crahe* involved a forged endorsement by a fiduciary attorney, it was decided in 1920, approximately 11 years before the Fiduciary Obligations Act became the law in Illinois.

In *Kallison*, the plaintiffs, who were co-partners, sued the defendant banks, Merchandise National Bank and Harris Trust and Savings Bank, on two counts, a complaint in law (count I), in which the cause of action is not specifically identified, and a claim in chancery for an accounting and dissolution (count II). Count II was allowed to stand but the trial court granted defendants' motion to dismiss count I based on a failure to state a cause of action. The plaintiffs appealed the dismissal of count I.

In *Kallison*, the facts showed the plaintiffs executed a partnership agreement with the third partner, Samuel Lamm, in which the three partners agreed to conduct their business under the firm name "Commander Products." Specifically, the partnership agreement required that all funds received on behalf of the partnership be immediately deposited into a certain bank, which was not one of the defendants and was designated as the depository for partnership funds. Under the partnership agreement, "any two" of the partners were given authority to sign checks on behalf of the partnership. The plaintiffs alleged that Lamm orally agreed to close his individual account in the name of "Commander Products Company" at Merchandise National Bank and that Lamm also agreed to cease to conduct any business under the name "Commander Products Company." The plaintiffs claimed in count I that the defendants improperly paid two checks that were improperly endorsed by Lamm and were wrongfully deposited into Lamm's personal bank account.

According to the plaintiffs, Lamm obtained two checks drawn on

the defendant Harris Trust and Savings Bank, which were payable to the order of "Commander Products Co.," and the funds represented in these checks were partnership funds. Lamm improperly endorsed the checks and deposited them into his personal account at Merchandise National Bank in violation of the partnership agreement. The plaintiffs never informed Merchandise National Bank or Harris Trust and Savings Bank that a partnership had been formed between them and Lamm, even though the partnership name was very similar to Lamm's prior trade name. As noted above, the defendant banks filed a motion to dismiss, the trial court dismissed the plaintiffs' complaint in law for failure to state a cause of action, and the plaintiffs appealed.

On appeal, the plaintiffs claimed that Lamm committed a forgery in endorsing the checks made payable to "Commander Products Co.," the name used by him before entering into the partnership agreement. The appellate court disagreed and found that Lamm's endorsement of those checks did not constitute a forgery because Lamm had authority to endorse the checks under the partnership agreement. *Kallison*, 338 Ill. App. at 38. Further, the court, relying upon two Pennsylvania decisions and section 9 of the Fiduciary Obligations Act, noted that what a fiduciary does with funds collected from an authorized endorsement "was of no legal moment to the bank" unless the bank had actual knowledge that the fiduciary was committing a breach of his obligation as fiduciary by making a deposit into his personal account. *Kallison*, 338 Ill. App. at 40. Although the court did observe that Lamm's failure to deposit the checks into the partnership account violated the partnership agreement, it held that the violation of a duty to deposit an endorsed check into a particular account did not constitute a forgery. *Kallison*, 338 Ill. App. at 40. Therefore, the court affirmed the trial court's dismissal of the plaintiffs' complaint in law.

*Kallison* is different from this case because the checks in *Kallison* were deposited into Lamm's personal account. Such action would implicate section 9 of the Fiduciary Obligations Act, which we have already found is inapplicable here. *Kallison* further establishes that section 9 does not trigger bank liability unless the bank had actual knowledge that the fiduciary was committing a breach of his obligation as fiduciary by making a deposit into his personal account. *Kallison*, 338 Ill. App. at 40. We fail to see how this case supports plaintiffs' position here.

The other Illinois decision plaintiffs rely upon with regard to this point is *Bellflower*, cited above, where the court in analyzing section 9 of the Fiduciary Obligations Act, said:

> "The purpose of the [Fiduciary Obligations] Act is to facilitate the fiduciary's performance of his responsibilities by limiting the li-

ability of those who deal with him [citation]; it does not purport to absolve a bank from liability when it pays a check on an unauthorized endorsement." *Bellflower*, 130 Ill. App. 3d at 86.

But as plaintiffs themselves acknowledge, this statement was made by the court while analyzing section 9 of the Fiduciary Obligations Act, which we have already determined does not apply here because the checks that Capetta deposited were deposited into a fiduciary account, not his personal account. Thus, *Bellflower* is distinguishable.

Plaintiffs further rely on *Leeds*, a New Jersey decision cited above, in support of their argument that section 3—420 of the UCC supercedes section 7 of the Fiduciary Obligations Act in this case. While plaintiffs acknowledge that *Leeds* is a foreign case, they point out that cases from foreign jurisdictions interpreting uniform acts are " 'given greater-than-usual deference since the general purpose of a uniform act is to make consistent the laws of the states that have enacted it.' [Citation.]" *Reed v. Doctor's Associates, Inc.*, 331 Ill. App. 3d 618, 622, 772 N.E.2d 372, 376 (5th Dist. 2002).

In *Leeds*, the plaintiffs hired an attorney, Louis Egnasko, to represent them in a mortgage foreclosure action and purchase and resale of property in New Jersey. The plaintiffs bought the property and entered into a contract to sell, which Egnasko handled, and he then accepted a settlement check on the plaintiffs' behalf. The settlement check was made payable to the plaintiffs. The check was drawn on United Jersey Bank, which became Summit Bank (Summit).

Egnasko altered the settlement check by typing "Louis Egnasko attorney for" above the payee line so it looked as though he was named as the payee on the check. He then endorsed the check and deposited it into his attorney trust account at Chemical Bank. Chemical later became Chase Manhattan Bank (Chase) as successor in interest. Egnasko subsequently drew a check from a different client trust account at Trust Company of New Jersey (Trustco). He paid the plaintiffs from funds out of the Trustco account but that account also contained funds that Egnasko had obtained by altering and depositing another check, which was payable to the Shrewsbury State Bank (Shrewsbury). Thus, Egnasko used funds owed to Shrewsbury in order to pay the plaintiffs. Facing a conversion claim by Shrewsbury, Trustco filed suit against Egnasko and the plaintiffs in New York. The plaintiffs filed an answer and cross-claim in the New York action asserting that they were not liable for the Shrewsbury funds.

The plaintiffs then filed an action in the New Jersey court alleging strict liability under a UCC conversion theory for payment on the altered settlement check against both Chase, the depository bank, and Summit, which was the drawer, drawee, payor bank. Chase and Sum-

mit filed summary judgment motions on a variety of grounds and the trial court granted summary judgment in favor of both defendants.

With regard to the plaintiffs' cause of action for conversion against Chase, the appellate court stated that the applicable provision was New Jersey's version of section 3—420(a) of the UCC. *Leeds*, 331 N.J. Super. at 421, 752 A.2d at 335. It further held it was undisputed that Egnasko was not authorized by the plaintiffs to endorse the check and had no right to receive or enforce payment on that check. *Leeds*, 331 N.J. Super. at 422, 752 A.2d at 336. The court found that such action constituted a forgery under the UCC and that Chase, by crediting Egnasko's trust account with the face amount of the check, paid the check to "a person not entitled to *** receive payment" in violation of section 3—420 of the UCC. *Leeds*, 331 N.J. Super. at 422, 752 A.2d at 336. The court further found Chase to be strictly liable on the plaintiffs' conversion claim under section 3—420 because Chase made or obtained "payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment." *Leeds*, 331 N.J. Super. at 423, 752 A.2d at 336. According to the court, the justification for strict liability upon the depository bank was that " 'the loss should normally come to rest upon the first solvent party in the stream after the one who forged the indorsement.' [Citation.]" *Leeds*, 331 N.J. Super. at 423, 752 A.2d at 336. It therefore found that the trial court improperly granted summary judgment against the plaintiffs and in favor of Chase. *Leeds*, 331 N.J. Super. at 423, 752 A.2d at 337.

The court also addressed the defendants' contention that they were protected by section 3B:14—58 of the Uniform Fiduciary's Law (N.J. Stat. Ann. § 3B:14—58 (West 1996)), New Jersey's version of section 9 of the Fiduciary Obligations Act. The court found that reliance on this section was misplaced with regard to Chase because Egnasko did not draw the check he deposited with Chase, and the funds he deposited were not "held by him as a fiduciary" because he altered the check to add his name as payee. *Leeds*, 331 N.J. Super. at 425, 752 A.2d at 338. It further held that the Fiduciary Obligations Act did not "insulate the bank from liability under the UCC just because the depositor or endorser also happen[ed] to be a fiduciary. [Citation.]" *Leeds*, 331 N.J. Super. at 426, 752 A.2d at 338. According to the court, Chase's liability to the plaintiffs was not the result of the bank's failure to inquire into Egnasko' breach of his fiduciary obligation, but for accepting a forged and altered check for deposit, irrespective of the circumstance that the forger was also a fiduciary with respect to his clients and the owners of funds in his attorney trust account. *Leeds*, 331 N.J. Super. at 426, 752 A.2d at 338. Chase could not "avail itself of

the protection of [section 9] because Chase's liability here [arose] out of its payment on an altered check—conversion as defined by the UCC—and not out of Egnasko's subsequent disposition of the proceeds of that check." *Leeds*, 331 N.J. Super. at 426, 752 A.2d at 339.

Finally, the court reasoned that Chase's proposed application of the Fiduciary Obligations Act implicitly treated the altered check as if it were properly payable to and endorsed by Egnasko as fiduciary for the plaintiffs, thereby ignoring section 3—420. *Leeds*, 331 N.J. Super. at 426-27, 752 A.2d at 339. It further stated that if it were to accept Chase's argument that the "shield" of the Fiduciary Obligations Act superceded the liability imposed by section 3—420, the result would be "to allow a dishonest fiduciary, indeed a forger, to insulate his bank from liability not just for his misapplication of funds entrusted to him as a fiduciary, but also for conversion of funds *not* entrusted, funds obtained by his forgeries, for which the bank would otherwise be strictly liable." (Emphasis in original.) *Leeds*, 331 N.J. Super. at 427, 752 A.2d at 339. Therefore, the court concluded that the facts before it were not provided for in the Fiduciary Obligations Act and the plaintiffs' claim against Chase was firmly governed by section 3—420 of the UCC. *Leeds*, 331 N.J. Super. at 428, 752 A.2d at 340.

We find that *Leeds* is not persuasive here for several reasons.

First, cases from foreign jurisdictions are not binding on this court. *Mount Vernon Fire Insurance Co. v. Heaven's Little Hands Day Care*, 343 Ill. App. 3d 309, 320, 795 N.E.2d 1034 (2003).

Second, while *Leeds* interpreted New Jersey's version of section 9 of the Fiduciary Obligations Act, it did not specifically address section 7, which is the applicable section in this case. In Illinois, section 9 has been interpreted as a "broad rule" under the Fiduciary Obligations Act which applies "where a fiduciary makes deposits to his personal account, even of checks payable to himself as a fiduciary or of checks payable to the principal and endorsed by the fiduciary, the bank has no liability for withdrawals in the absence of actual knowledge of the breach of the fiduciary obligation or bad faith." *Edgcomb*, 274 Ill. App. 3d at 436-37. The Fiduciary Obligations Act has been held to cover all sorts of situations where fiduciaries deal with the funds of their principals, and provides that all inconsistent acts are repealed. *Edgcomb*, 274 Ill. App. 3d at 441. According to *Edgecomb*, "[t]he law which previously applied to cases 'not provided for in [the Fiduciary Obligations Act]' continues to apply [citation], but it is difficult to conceive of any situation not provided for by the Act." *Edgcomb*, 274 Ill. App. 3d at 441. Although we are not called upon to interpret section 9, it appears that the *Leeds* decision, specifically its finding that the UCC supercedes the Fiduciary Obligations Act, is at odds with our decision in *Edgcomb*.

Last, it is unclear why the *Leeds* court did not discuss section 7 of the Fiduciary Obligations Act, and instead discussed section 9, when the facts showed that Egnasko deposited the plaintiffs' funds into his fiduciary account. We are therefore unpersuaded by the reasoning in *Leeds* and decline to follow it in the instant case.

Based on our discussion above, we hold that section 7 of the Fiduciary Obligations Act relieves First Bank of liability in this case as to count I. Therefore, we affirm the trial court's decision granting summary judgment in First Bank's favor with regard to count I and need not consider First Bank's other arguments.

We next examine whether summary judgment was proper under count II. Plaintiffs contend that the trial court erred in granting summary judgment on count II because First Bank took misappropriated funds from Capetta's client escrow account in payment of or as security for a debt that it knew to be a personal debt of Capetta's. As discussed above, plaintiffs argue that Capetta's mortgage debt with First Bank was secured by funds in Capetta's First Bank accounts, including plaintiffs' funds in the client escrow account. According to plaintiffs, their allegations raise a genuine question of fact as to whether First Bank had notice of Capetta's breach of a fiduciary duty under section 3—307. Therefore, plaintiffs contend that they have a viable claim of interest under sections 3—306 and 3—307 of the UCC. First Bank responds that as a matter of law it did not have notice of Capetta's fiduciary breach under section 3—307.

Section 3—306 of the UCC provides:

"Claims to an instrument. A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds. A person having rights of a holder in due course takes free of the claim to the instrument." 810 ILCS 5/3—306 (West 2000).

Section 3—307 of the UCC provides, in relevant part:

"(b) If (i) an instrument is taken from a fiduciary for payment or collection or for value, (ii) the taker has knowledge of the fiduciary status of the fiduciary, and (iii) the represented person makes a claim to the instrument or its proceeds on the basis that the transaction of the fiduciary is a breach of fiduciary duty, the following rules apply:

***

(2) In the case of an instrument payable to the represented person or the fiduciary, as such, the taker has notice of the breach of fiduciary duty if the instrument is (i) taken in payment of or as security for a debt known by the taker to be the personal debt of

the fiduciary, (ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary, or (iii) deposited to an account other than an account of the fiduciary, as such, or an account of the represented person.

\*\*\*

(4) If an instrument is issued by the represented person or the fiduciary, as such, to the taker as payee, the taker has notice of the breach of fiduciary duty if the instrument is (i) taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary, (ii) taken in a transaction known by the taker to be for the personal benefit of the fiduciary, or (iii) deposited to an account other than an account of the fiduciary, as such, or an account of the represented person." 810 ILCS 5/3—307(b)(2), (b)(4) (West 2000).

The official comment to section 3—307 states that subsection b applies only if the person dealing with the fiduciary " 'has knowledge of the fiduciary status of the fiduciary.' " 810 ILCS Ann. 5/3—307, Uniform Commercial Code Comment 2, at 164 (Smith-Hurd 1993). Further, paragraphs (2) and (4) of section 3—307(b) require that the person acting for the organization have knowledge of facts that indicate a breach of fiduciary duty. 810 ILCS Ann. 5/3—307, Uniform Commercial Code Comment 2, at 164 (Smith-Hurd 1993). *Edgcomb* holds that the knowledge of an organization is determined by the knowledge of the individual who conducts the transaction. *Edgcomb*, 274 Ill. App. 3d at 439. Further, notice, which does not amount to knowledge, is not enough to cause section 3—307 to apply. 810 ILCS Ann. 5/3—307, Uniform Commercial Code Comment 2, at 164 (Smith-Hurd 1993).

Here, plaintiffs were required to show that the specific First Bank employee who accepted the checks at issue had actual notice that Capetta was breaching his fiduciary duty to plaintiffs. Plaintiffs did not provide any such evidence.

Additionally, there is no evidence that First Bank took checks in payment of or as security for a debt known by First Bank to be a personal debt of Capetta. As set forth in detail above, plaintiffs have not raised an issue of material fact that their funds in the escrow account were used to pay Capetta's mortgage. While it is true that the 10 checks attached to plaintiffs' motion to reconsider were drawn on Capetta's escrow account and made payable to First Bank, there is no evidence that First Bank took these checks in payment of or as security for a debt known by First Bank to be a personal debt of Capetta or that the checks indicated a breach of Capetta's fiduciary obligations to plaintiffs. As already noted above, First Bank, in its response to

plaintiffs' motion to reconsider, demonstrated that three of these checks were "written out" of the escrow account before plaintiffs' checks were deposited. The remaining seven checks were made payable to First Bank so that Capetta could purchase cashiers' checks made payable to third parties. The trial court observed that on the record plaintiffs provided, "it [was] impossible to tie the seven checks presented in plaintiffs' motion to reconsider to any (or all) of plaintiffs' three checks." It also found that the dates and amounts of the seven checks presented did not match those of plaintiffs' checks and plaintiffs did not establish that any of the seven checks drawn by Capetta from his escrow account represented the proceeds of any of plaintiffs' checks.

According to plaintiffs, documentation of Capetta's First Bank accounts, including the client escrow account into which plaintiffs' checks were deposited, created the "reasonable inference" that these accounts were used as collateral for the mortgage on Capetta's home. As previously mentioned, plaintiffs support this claim with a 66-page citation to the record that provides no specific documentation that Capetta's mortgage debt was secured by his client escrow account. Thus, plaintiffs' "reasonable inference" is not supported by any definitive evidence. As we noted above, failure to provide relevant citations to the record amounts to a waiver under Supreme Court Rule 341(e)(7). *McGovern*, 337 Ill. App. 3d at 38. We therefore find this argument waived.

Waiver aside, the one case relied upon by plaintiffs in support of their argument is distinguishable. In *Falk v. Northern Trust Co.*, 327 Ill. App. 3d 101, 763 N.E.2d 380 (2001), the plaintiff alleged that the defendant bank was placed on notice that an employee fiduciary of the plaintiff's misappropriated approximately $2 million from his accounts in violation section 3—307 of the UCC. The plaintiff sought reversal of the trial court's dismissal of his second amended complaint on the ground that the limitations period had expired. The appellate court determined that the legislature did not intend the limitations provision to apply to banks acting in bad faith. *Falk*, 327 Ill. App. 3d at 109. The court then considered whether the plaintiff had alleged sufficient facts to support a claim that the bank acted in bad faith.

The facts showed that the employee fiduciary had worked for the plaintiff for 13 years. She handled the plaintiff's personal bills, bookkeeping, and reporting to his accounts. She was a signatory on the plaintiff's demand accounts at the bank and the bank knew that she was the plaintiff's fiduciary. The employee fiduciary began misappropriating funds from the plaintiff's accounts for her own personal benefit. She drew large amounts from the plaintiff's accounts through

checks made payable to cash, which she used to pay her personal obligations such as bank loans she had with the defendant bank and the obligations of her friends and business associates at the defendant bank.

The plaintiff argued that the defendant was on notice of the fiduciary employee's misappropriations of his funds by the number of changes and irregularities in the plaintiff's account activity at the bank. The bank also accepted a $2,000 check drawn on the plaintiff's account for payment of the fiduciary employee's personal equity credit line at the bank. The record further showed that the fiduciary employee maintained her own accounts at the bank, including her mortgage and equity line of credit. Because the bank made loans to the fiduciary employee and had access to her tax returns, the plaintiff argued that the bank was aware that her income was insufficient to support the activity in her accounts.

Based on the above, the appellate court found that the plaintiff had alleged sufficient facts to show that the bank acted in bad faith when it failed to conduct an investigation into the fiduciary employee's check-writing activities in light of the fact that it was on notice that she was in breach of her fiduciary duties to the plaintiff. *Falk*, 327 Ill. App. 3d at 112. It therefore reversed the trial court's dismissal of plaintiff's second amended complaint.

*Falk* is distinguishable from the instant case. Here, the 10 checks attached to plaintiffs' motion to reconsider were drawn on Capetta's own escrow account, rather than on an account maintained by the plaintiffs. In *Falk*, the defendant bank should have been able to cross-match large sums that were drawn from the plaintiff's account and that were then immediately deposited into the fiduciary employee's personal account at the same bank. Here, the funds were drawn by Capetta on his client escrow account and there is no evidence that First Bank took checks in payment of or as security for a debt known by First Bank to be a personal debt of Capetta. Under these facts the requirements of section 3—307(b)(4)(i) have not been met so as to withstand summary judgment.

For the reasons above, we find that the trial court properly granted summary judgment in favor of First Bank with regard to counts I and II and the orders of the trial court are affirmed.

Affirmed.

CAHILL, P.J., and GORDON, J., concur.