**BELL BROTHERS, et al.,**
**Plaintiffs–Appellants,**

v.

**BANK ONE, LAFAYETTE, N.A. (formerly known as Purdue National Bank), Defendant–Appellee.**

**No. 96–3455.**

United States Court of Appeals, Seventh Circuit.

Argued May 22, 1997.

Decided June 20, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied July 18, 1997.

Walter E. Bravard, Jr., Dean E. Richards (argued), Indianapolis, IN, for plaintiffs–appellants.

Cheryl M. Knodle, Michael J. Stapleton (argued), Ball, Eggleston, Bumbleburg & McBride, Lafayette, IN, for defendant–appellee.

Before COFFEY, EASTERBROOK, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

A group of fleeced investors filed this suit more than 13 years ago. William Tully and some associates created a series of partnerships known as the Mid–America Energy Oil and Gas Program. Promoters pitched the program in hotels' meeting rooms; no underwriter, dealer, or other financial intermediary looked out for these unsophisticated investors' interests. The offering circulars said that funds would be held in escrow accounts at Purdue National Bank (now Bank One, Lafayette), which would safeguard the money until each partnership reached a minimum capitalization. Tully and his associates did not honor their promises. The Bank did not act as escrow agent, and the promoters didn't wait for full capitalization (or, for that matter, invest the proceeds as the circulars promised). Ever since, the investors have been searching for deep pockets to make good the losses. The promoters settled with the investors in 1986. Other aspects of the case, such as the claims against the attorneys who prepared the offering circulars, also have been wrapped up, although not without some collateral litigation. *Insurance Corp. of America v. Dillon, Hardamon & Cohen,* 725 F.Supp. 1461, 1478 (N.D.Ind.1988). Only claims against the Bank—under RICO and Indiana law—remain for decision. Plaintiffs agreed that their RICO theory would fail if the Bank won on the claims under Indiana law. On the eve of trial, the district court granted summary judgment to the Bank on a defense that was apparent from the complaint. Although the long delay could and should have been avoided, we agree with the district court that the investors could not prevail at trial, so the judgment is sound. (The pending RICO claim made it proper for the district court to exercise supplemental jurisdiction over the state-law claim.)

The Bank was not a promoter or underwriter of the partnerships; it did not sign the offering circulars or have a financial interest in the ventures. (Although the parties call the offering documents "prospectuses," this is misleading because the securities were not registered. See *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995).) According to the circulars, the Bank was to serve as escrow agent. Nonetheless, Tully placed the money into demand accounts, over which he had (and used) full dominion. Plaintiffs believe that the Bank's failure to control access to the funds defrauded them. Plaintiffs have been unable to find any documents to show that the Bank *agreed* to hold the stakes in escrow; the statements to this effect in the circulars may have been among Tully's fictions. But the district court believed that there was a material dispute about what the Bank agreed to do, for some witnesses are willing to testify that they saw written escrow agreements (although none has been able to produce a copy). Like the district court, we will assume that the Trust Department of the Bank promised to act as an escrow agent and told some investors so. What ended the case was the sequence we

have already mentioned, now with emphasis: *"Tully placed* the money into demand accounts, over which he had (and used) full dominion." That is to say, the investors did not remit funds to the Trust Department of the Bank as escrow agent; they gave negotiable instruments to Tully, who deposited them into commercial accounts at the Bank. The district judge concluded that, under Indiana law, the fact that the money came first to Tully, and only later to the Bank, meant that the Bank could not be responsible to the investors.

Indiana treats delivery of the property to the depository agent as an essential element of an escrow. *Nation v. Green*, 188 Ind. 697, 123 N.E. 163 (1919); *Osborne v. Eslinger*, 155 Ind. 351, 58 N.E. 439 (1900); *Snyder v. International Harvester Credit Corp.*, 147 Ind.App. 364, 261 N.E.2d 71, 73 (1970). Plaintiffs did not deliver anything to the Bank; instead they made and delivered negotiable instruments to Tully or one of the other promoters. Each check was payable to the order of a Mid–America partnership or an affiliated firm, not to the Bank as an agent. Payment to the promisee is inconsistent with an escrow arrangement. *Clanin v. Esterly Harvesting Machine Co.*, 118 Ind. 372, 21 N.E. 35 (1889). That the offering circulars did not explain to the investors how to take advantage of the promised escrow is another black mark against Tully and his lawyers, but the facts are inescapable. As it happens, the partnerships deposited most of the checks in accounts at the Bank, rather than some other financial institution. Plaintiffs ask us to treat this as equivalent to delivery from the investors to the Bank; after all, they say, the funds came into the Bank's hands. So they did—but not into the Bank's hands *as the investors' agent.* Banks do not possess discretion over demand accounts. A bank is obliged to honor the instructions of the depositor and account-holder. Cf. *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir.1988). An escrow curtails the risk, created by the difference between the time of one party's payment and the other party's performance, that the second party will prove unfaithful. The agent holds the stakes until the agreed part of the performance has been completed, then transmits the funds. When the promisee receives direct payment, a stake-holding agent serves no function.

Which bank the promisee uses for its checking account is irrelevant. Requiring a bank to restrict all deposits until satisfying itself that the depositor is entitled to the money would pour molasses on the gears of commerce—and with little benefit to people like the plaintiffs, for malefactors would just make sure that they did not maintain their accounts at the banks that were supposed to be escrow agents. Plaintiffs' brief says that, when they saw that their checks had been paid through the Bank, they "were pulled [sic] into believing that their subscription checks were accepted by the partnership and that their monies were safe in an 'escrow account' under the protection of with [sic] Purdue National Bank." Suppose a review of the canceled checks or some other event lulled the investors; so what? By then it was too late for them to stop payment on the checks; the promoters had the money under their control. Just so with plaintiffs' contention that Gary Porro, former chief of the Bank's Trust Department, told some of their number that funds were being held in escrow. Plaintiffs have not cited any case, in or out of Indiana, supporting the proposition that a promisor's payment to the promisee, who maintains a checking account at a bank, can expose a bank to liability for a breach of a supposed fiduciary duty to the promisor. Our own research has not turned up such a case, and although no case rejects such a duty either, so novel is the plaintiffs' argument, we do not think that Indiana would endorse it. For reasons we have explained, plaintiffs' position would create costs for all bank depositors without corresponding benefits. If plaintiffs wanted to urge such an original position, they should have filed the case against the Bank in state court, which could have resolved both the RICO claim and the state-law theory. *Tafflin v. Levitt*, 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). When state law governs, state rather than federal courts must be the innovators.

AFFIRMED.