# Illinois Official Reports

## Appellate Court

---

### *Praither v. Northbrook Bank & Trust Co.*, 2021 IL App (1st) 201192

---

| | |
|---|---|
| Appellate Court Caption | JOHN PRAITHER and MARCELLO CALIVA, Individually and on Behalf of a Class of Similarly Situated Individuals, Plaintiffs-Appellants, v. NORTHBROOK BANK & TRUST COMPANY, an Illinois Chartered State Bank, and TAMER MOUMEN, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>No. 1-20-1192 |
| Filed | July 30, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2018-CH-12935; the Hon. Sophia Hall, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Alexander N. Loftus, of Loftus & Eisenberg, Ltd., of Chicago, for appellants.<br><br>Michael P. Conway, Kristina K. Cercone, and Taylor M. Grode, of Jones Day, of Chicago, for appellee Northbrook Bank and Trust Company.<br><br>No brief filed for other appellee. |

JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Connors and Oden Johnson concurred in the judgment and opinion.

# OPINION

¶ 1       Plaintiffs, John Praither and Marcello Caliva, individually and on behalf of a class of similarly situated individuals, appeal the judgment of the circuit court granting defendant Northbrook Bank & Trust Company's (Northbrook) motion to dismiss plaintiffs' second-amended complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2016)). On appeal, plaintiffs contend the court erred in dismissing their second-amended complaint where the complaint sufficiently pled facts that (1) defendant Northbrook failed to exercise ordinary care to protect plaintiffs from defendant Tamer Moumen's fraud, (2) Northbrook was liable for violations of the Fiduciary Obligations Act (Act) (760 ILCS 65/1 *et seq.* (West 2016)), and (3) Northbrook aided and abetted Moumen's breach of fiduciary duty. For the following reasons, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3       The trial court dismissed plaintiffs' second-amended complaint on October 29, 2020. Plaintiffs filed their notice of appeal on November 3, 2020. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered below.

¶ 4                                    II. BACKGROUND

¶ 5       Plaintiffs invested in hedge funds managed by Moumen. As part of his investment business, Moumen maintained three accounts at Northbrook. Two accounts, the Crescent Ridge Volatility Fund (CRVF) and the Crescent Ridge Energy Fund (CREF), were set up to receive initial investments. The third fund, Crescent Ridge Capital Partners (CRCP), belonged to the partnership managing the funds, which was an entity created and controlled by Moumen. To invest in a fund, parties such as plaintiffs wired money into the CRVF or CREF. Plaintiffs wired the money from their personal bank accounts or an IRA custodian.

¶ 6       Plaintiffs alleged that Moumen set up the Northbrook accounts as part of a Ponzi scheme in which he used money from new investors to pay other investors. Plaintiffs also alleged that Moumen used the money from the CRVF and CREF for personal expenses. In March 2017, Moumen was arrested by the Federal Bureau of Investigation (FBI), and in October 2017, he was sentenced to 10 years in prison. He was also ordered to pay restitution in the amount of $7,570,831.59.

¶ 7       In October 2018, plaintiffs filed a complaint against Northbrook and Moumen. The complaint alleged three counts: count I (negligence), count II (aiding and abetting breach of fiduciary duty) against Northbrook, and count III (unjust enrichment) against Moumen. Northbrook filed a motion to dismiss, arguing that plaintiffs failed to identify a source of duty on Northbrook's part toward noncustomers such as plaintiffs and that no laws or regulations

obligated Northbrook to freeze Moumen's accounts or alert investors of Moumen's actions. The trial court granted the motion.

¶ 8 Plaintiffs subsequently filed a first-amended complaint, which added a count against Northbrook for breach of the Act. Northbrook filed a motion to dismiss the three counts against them, and the trial court granted the motion without prejudice, finding that plaintiffs failed to allege facts sufficient to support their claims. Plaintiffs subsequently filed a second-amended complaint against defendants Northbrook and Moumen. Counts I through III alleged negligence, aiding and abetting breach of fiduciary duty, and violations of the Act against Northbrook. Count IV alleged a claim of unjust enrichment against Moumen.

¶ 9 Plaintiffs alleged the following facts in the second-amended complaint. Plaintiffs invested in CRVF and CREF by wiring money into the funds from "either their personal bank account or an IRA Custodian." The fund accounts were held at Northbrook. Plaintiffs "relied on the fact that the money was being sent to a reputable bank trust for deposit when choosing to invest in CRVF or CREF." Once they made an investment in one of these funds, plaintiffs became limited partners "upon subscription and acceptance by" Moumen, the general partner. From February 2013 to February 2017, investors deposited $6.6 million into the CRVF and CREF accounts at Northbrook.

¶ 10 As the general partner, Moumen was entitled to charge a management fee equal to 1% annually of each limited partner's share, plus a performance allocation of 17.5% of the funds' annual income. The complaint stated that "[t]his fee structure is quite common in *** hedge funds" like CRVF and CREF. This fee structure was outlined in the private placement memorandum (PPM), a copy of which was given to Northbrook.

¶ 11 Plaintiffs alleged that "Moumen misappropriated investor funds by causing funds to be transferred" from the accounts at Northbrook to his personal accounts, as shown by the following:

a. In March 2015, an investor wired $42,000 from his individual retirement account (IRA) with Kingdom Trust to the CRVF, and the next day Moumen wired $42,000 from the CRVF account to his personal brokerage account at TD Ameritrade.

b. In November 2014, an investor deposited $200,000 into the CRVF, and that same day, Moumen transferred $38,000 to a Bank of America account in his name. Moumen transferred another $150,000 to a personal brokerage account at TD Ameritrade.

c. On January 27, 2015, investors wired $169,000 to the CRVF, which had a balance of $0, and that day Moumen transferred $18,000 to his personal account at Bank of America. Moumen then purchased a cashier's check to pay rent on his personal residence.

d. On February 3, 2016, an investor wired $240,000 into the CRVF, which had a balance of $152. Moumen then transferred $92,000 to the CRCP and, the next day, wired $90,188 from the CRCP account to Tesla Motors for purchase of a vehicle.

e. On August 25, 2016, an investor deposited $47,000 into the CRVF, which was overdrawn at the time. Four days later, Moumen transferred $46,600 to his personal account at Bank of America. He used these funds to pay a personal tax liability.

Moumen also used funds from new investors to pay earlier investors. On May 13, 2015, after an investor deposited $131,000 into the CRVF, Moumen paid $36,000 from this account to

another investor. Likewise, On August 31, 2015, after an investor wired $250,000 into the CRVF, Moumen paid an earlier investor $75,000 from the account.

¶ 12     Plaintiffs alleged that, pursuant to regulations prescribed under the Bank Secrecy Act (BSA) (12 U.S.C. § 5311 *et seq.* (2018)), Northbrook must collect information about the holders of all of its accounts. Therefore, in accordance with its obligations under the BSA, Northbrook "developed, administered, and maintained a program that ensured compliance with the BSA." "[U]pon information and belief," Northbrook complied with the controlling regulations. Plaintiffs alleged that "Northbrook Bank was fully compliant with the BSA and by complying with the BSA and its various requirements to 'know the customer,' Moumen and the [funds], it had actual knowledge of Moumen's fraudulent scheme soon after it became clear Moumen was not investing client money in any way."

¶ 13     Although Northbrook was compliant with federal regulations, the complaint alleged that it did not enforce or implement the policies put in place to prevent money laundering. One requirement was the appointment of a third-party administrator to oversee the funds' transactions. Northbrook contacted Moumen and informed him that he needed an administrator and even threatened to terminate its business relationship with Moumen. Moumen, however, never named a third-party administrator.

¶ 14     Plaintiffs alleged that Northbrook also contacted Moumen to inquire about several transfers of money into his personal account. Moumen told Northbrook that he was paying himself fees by using his personal account as a pass-through account. Northbrook accepted Moumen's explanation. Plaintiffs alleged that Northbrook enabled Moumen to perpetrate his scheme by failing "to adhere to the regulatory guidance, banking industry standards, and its own policies" and by not responding to "the obvious suspicious nature of the transactions."

¶ 15     In December 2016, Northbrook was served with a subpoena from the FBI seeking records for the Northbrook fund accounts. Northbrook contacted Moumen "within days of receiving the federal subpoena." Northbrook also filed a Suspicious Activity Report. See 12 C.F.R. § 21.11 (2010). A few months later, Moumen was arrested by the FBI. In October 2017, Moumen was sentenced to 10 years in prison and ordered to pay plaintiffs $7,570,831.59 in restitution.

¶ 16     Northbrook filed a section 2-615 motion to dismiss, arguing that count I fails because plaintiffs did not allege a source of duty on the part of Northbrook and, furthermore, they failed to identify any regulation or industry standard that would have obligated Northbrook to freeze Moumen's accounts or alert investors of his actions. Counts II and III fail because plaintiffs did not allege facts showing Northbrook actually knew of or refrained in bad faith from investigating Moumen's activities.

¶ 17     After a hearing, the trial court granted the motion to dismiss with prejudice. The court again found the complaint did not allege sufficient facts to support plaintiffs' conclusions. Plaintiffs filed a notice of appeal, but this court dismissed the appeal because the trial court's order did not dispose of the claim against Moumen. See *Praither v. Northbrook Bank & Trust Co.*, 2020 IL App (1st) 192451-U. On remand, plaintiffs moved to voluntarily dismiss the count against Moumen, and on October 29, 2020, the trial court entered a final order. Plaintiffs filed this appeal.

- 4 -

¶ 18                                    III. ANALYSIS

¶ 19      First, we address plaintiffs' contention that the trial court erred in dismissing their negligence claim. In an action for negligence, plaintiffs must establish that Northbrook owed a duty to them, Northbrook breached that duty, and the breach proximately caused an injury to plaintiffs. *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22. "A legal duty refers to a relationship between the defendant and the plaintiff such that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Id.* Without a duty, plaintiffs cannot recover for negligence. *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991). Whether a duty exists is a question of law we review *de novo. Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 445 (1996).

¶ 20      Our supreme court has acknowledged that "duty" is not a fact discoverable in nature; rather, it is an involved, complex, and nebulous concept. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 435 (2006). Under common law, a duty of ordinary care may be found after consideration of the following factors: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 18. Whether these factors are sufficient to establish a duty depends on the public policy considerations inherent to the analysis of a particular case. *Id.* The weight accorded to each factor is also case-specific. *Id.*

¶ 21      "As with attorneys and accountants, the law has long imposed on banks a duty of reasonable care ***." *Mutual Service Casualty Insurance Co. v. Elizabeth State Bank*, 265 F.3d 601, 618 (7th Cir. 2001). For example, in Illinois "a bank's failure to observe ordinary care in handling its customer's transactions may support a tort claim." *Id.* (citing *Menerey v. Citizens First National Bank*, 160 Ill. App. 3d 223 (1987)). Plaintiffs, however, admitted that they were not customers of Northbrook and did not hold accounts there. Illinois courts have consistently held that banks do not owe a general duty of care to noncustomers. See *Thompson v. Capital One Bank, Inc.*, 375 F. Supp. 2d 681, 683-84 (N.D. Ill. 2005). In the absence of a duty Northbrook owed to plaintiffs, their negligence claim must fail.

¶ 22      Plaintiffs, however, argue that Northbrook owed them a duty of care because "[e]ach person has a duty to use ordinary care so that he does not cause injury or damage to others," citing *Stribling v. Chicago Housing Authority*, 34 Ill. App. 3d 551 (1975). Plaintiffs contend that, pursuant to *Stribling*, Northbrook should have exercised its ordinary duty of care by closing or freezing the affected accounts in order to prevent damage to plaintiffs.

¶ 23      In *Stribling*, the tenants of an apartment building owned by the defendant observed people entering and leaving vacant apartments. *Id.* at 553. Their apartment was burglarized when the offenders made a hole through the wall separating the tenants' apartment and a vacant apartment. They notified defendant, but defendant failed to respond. A second burglary into the apartment occurred a month later, using the same method. *Id.* at 554. The court found that, after having notice of the first burglary, the second burglary "became eminently foreseeable." *Id.* at 556. Thus, defendant owed a duty to its tenants to guard against the subsequent burglary. *Id.*

¶ 24      *Stribling* is inapposite. *Stribling* involved the question of duty on the part of a building owner to a tenant. Here, the question is whether Northbrook owed a duty to plaintiffs, who were not customers of Northbrook. As a result, the policy considerations inherent in *Stribling* differ vastly from the considerations relevant here.

¶ 25    Furthermore, the court in *Stribling* found a duty because the building owner could reasonably foresee criminal activity where the affected tenants had informed them of previous break-ins. The likelihood of the injury in *Stribling* "became eminently foreseeable" based on the owner's knowledge. *Id.* Here, plaintiffs did not allege that a party facing harm directly informed Northbrook of Moumen's wrongdoing or that an employee raised concerns about Moumen's transfers. Instead, they generally alleged that Northbrook must have known about Moumen's criminal activity because it fully complied with the monitoring requirements of the BSA. The knowledge plaintiffs attribute to Northbrook does not compare to the immediacy of the building owner's knowledge of the situation in *Stribling*. Thus, *Stribling* does not support their claim that Northbrook had a duty of ordinary care towards them.

¶ 26    Plaintiffs next contend that their complaint sufficiently alleged a claim under the Act, where Northbrook had actual knowledge that Moumen breached his fiduciary duty to them. At common law, a third party such as Northbrook could be held liable to the principal if it negligently assisted a fiduciary who misappropriated the principal's funds. *Appley v. West*, 832 F.2d 1021, 1029 (7th Cir. 1987). The Uniform Fiduciaries Act (Unif. Fiduciaries Act § 6, Comment, 7A U.L.A. 410 (1985)), which Illinois codified and titled the Fiduciary Obligations Act, was designed to change that case law. *County of Macon v. Edgcomb*, 274 Ill. App. 3d 432, 435 (1995); *Appley*, 832 F.2d at 1030-31.

¶ 27    The purpose of the Act is "to facilitate the fiduciary's performance of his responsibilities by limiting the liability of those who deal with him." *Bellflower AG Service, Inc. v. First National Bank & Trust Co.*, 130 Ill. App. 3d 80, 85 (1985). It covers situations where a party "honestly deals with another knowing him to be a fiduciary." *Johnson v. Citizens National Bank of Decatur*, 30 Ill. App. 3d 1066, 1069-70 (1975). Under these circumstances, the depository bank is relieved of the duty to ensure that the funds are properly applied, and the principal bears the "burden to employ honest fiduciaries." *Id.* at 1070. There is a strong policy reason supporting this position: given the number of transactions that run through banks, "restrict[ing] all deposits until [the bank satisfies] itself that the depositor is entitled to the money would pour molasses on the gears of commerce." *Bell Brothers v. Bank One, Lafayette, N.A.*, 116 F.3d 1158, 1160 (7th Cir. 1997).

¶ 28    While the Act relieves a bank of liability for negligence regarding the fiduciary's misconduct, it allows a cause of action when the bank has actual knowledge that the fiduciary is breaching his obligation or " 'has knowledge of facts that its action in paying the checks amounts to bad faith.' " *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 49 (2005) (quoting *Go-Tane Service Stations, Inc. v. Sharp*, 78 Ill. App. 3d 785, 789-90 (1979)). "Actual knowledge" is " 'the awareness at the moment of the transaction that the fiduciary is defrauding the principal' or having express factual information" that the fiduciary's use of funds is improper. (Internal quotation marks omitted.) *Time Savers, Inc. v. La Salle Bank, N.A.*, 371 Ill. App. 3d 759, 768 (2007) (quoting *Continental Casualty Co. v. American National Bank & Trust Co. of Chicago*, 329 Ill. App. 3d 686, 703 (2002)). Actual knowledge may be based on circumstantial or direct evidence. *People v. Hinton*, 402 Ill. App. 3d 181, 185 (2010). However, whichever evidence is used, "the inference of knowledge must [be] 'based on established facts and not pyramided on an intervening inference.' " *Id.* (quoting *People v. Pinta*, 210 Ill. App. 3d 1071, 1078 (1991)). *Mikrut* and *Time Savers* illustrate this point.

¶ 29    In *Mikrut*, the plaintiffs alleged that their fiduciary, Anthony Capetta, improperly endorsed checks representing proceeds from their brother's estate and deposited them into his escrow

account for clients at First Bank of Oak Park (First Bank). *Mikrut*, 359 Ill. App. 3d at 41. Capetta, who was not authorized to endorse the checks, improperly forged their endorsements before depositing them into the escrow account. The plaintiffs further alleged that Capetta then spent the funds for his personal benefit. *Id.* at 42-43.

¶ 30    To support their allegations, the plaintiffs presented evidence showing that (1) Capetta had been a customer of First Bank for many years; (2) he had three personal accounts at First Bank in addition to the client escrow account; (3) Capetta and his wife obtained a mortgage at First Bank, secured by real property, in the amount of $310,000; and (4) Capetta provided legal services to three principals at First Bank, including drafting wills, setting up trusts, and assisting in the purchase of real estate. *Id.* at 43-44. The plaintiffs contended that, from these facts, one could conclude that Capetta had a relationship with high-ranking First Bank officers and that First Bank had access to Capetta's financial information. As a result, First Bank should have discovered that Capetta's personal expenditures exceeded his income, and a trier of fact could infer that First Bank had sufficient knowledge of the fraudulent nature of the transactions. *Id.* at 50.

¶ 31    This court found that the evidence failed to show First Bank had actual knowledge that Capetta was breaching his fiduciary duty in depositing the checks. *Id.* We noted that an organization's knowledge "is determined by the knowledge of the individual who conducts the transaction." *Id.* "Specifically, plaintiffs have failed to provide any evidence that the individual or individuals at First Bank who conducted the transaction and accepted the checks at issue had any such knowledge." *Id.* at 51. With no facts establishing this knowledge, the plaintiffs could not show actual knowledge as required to hold First Bank liable for Capetta's actions. *Id.*

¶ 32    In *Time Savers*, Time Savers, Inc. (TSI), sold and rented used trailers and aerial lift platforms used in construction, painting, and road maintenance. *Time Savers*, 371 Ill. App. 3d at 761. TSI was owned by Stephen J. Harrison, who had a 20% interest, and Lawrence C. Kozlicki, who had an 80% interest. *Id.* Harrison also owned a separate business, RDSJH Equipment Venture, LLC (RDSJH), with his partner, Rick Dahl. *Id.* at 761-62. RDSJH operated a similar business as TSI.

¶ 33    From 1997 to 2001, TSI obtained revolving credit at La Salle Bank and refinanced and restructured its debt to La Salle Bank numerous times. By October 2001, TSI's finances deteriorated, and its loans were assigned to La Salle Bank's special assets group. TSI was no longer a customer of La Salle Bank by May 2002. *Id.* at 762.

¶ 34    In October 2002, TSI filed a complaint against La Salle Bank and its loan officer. In its third-amended complaint, TSI alleged that La Salle Bank had actual knowledge that Harrison embezzled funds from TSI by purchasing equipment for RDSJH using TSI funds and then renting that equipment to TSI. *Id.* at 763. Harrison allegedly purchased the equipment with money from TSI's revolving credit account, and the account was replenished with funds Harrison and/or RDSJH subsequently borrowed from La Salle Bank. The complaint alleged that La Salle Bank had actual knowledge of Harrison's scheme as shown by various letters and loan committee documents and from conversations Harrison had with La Salle Bank's loan officer, Patrick Stoltz. *Id.* at 764-65.

¶ 35    This court found, however, that the attached documents "merely show that La Salle knew Harrison was a fiduciary of TSI, that Harrison was a signatory to TSI's accounts, and that Harrison directed TSI funds to be paid to an RDSJH account." *Id.* at 770. While TSI alleged

that La Salle Bank had actual knowledge of wrongdoing through Harrison's conversations with Stoltz, TSI provided no details about the conversations. Furthermore, the letters and loan documents did not "suggest any improprieties on Harrison's part." *Id.* They merely established that TSI and RDSJH regularly conducted business together and Harrison was part owner of each business. We noted that TSI cannot defeat a motion to dismiss simply by reciting the words "actual knowledge." *Id.*

¶ 36    Pursuant to *Mikrut* and *Time Savers*, plaintiffs must plead facts showing that Northbrook knew of Moumen's wrongdoing when the transactions occurred. Here, plaintiffs have not alleged sufficient facts to support that, at the time the transfers occurred, Northbrook knew Moumen was breaching his fiduciary duty to plaintiffs. Plaintiffs did not allege that Northbrook's employees who processed the transfers had any knowledge of Moumen's misconduct. See *Mikrut*, 359 Ill. App. 3d at 50 (finding that an organization's knowledge "is determined by the knowledge of the individual who conducts the transaction"). Plaintiffs make some allegations of transfers from the fund accounts to Moumen's personal Bank of America account, and from that account Moumen used money to pay rent on his residence and to pay a personal tax liability. While this allegation was ostensibly made to show the impropriety of Moumen's transfers, it does not establish Northbrook's actual knowledge, since the money used to pay these expenses came out of the Bank of America account, not Northbrook.

¶ 37    Plaintiffs alleged in their complaint that Northbrook was fully compliant with the BSA; Moumen, the funds' manager, transferred money from the fund accounts to his personal bank and trading accounts; Northbrook inquired into some of Moumen's transfers and accepted his explanation; Northbrook failed to enforce some of its policies including the requirement of a third-party administrator; Moumen transferred funds to the CRCP and from there funds were transferred to Tesla; and Moumen paid himself a total of $384,788 from the funds. From these facts, plaintiffs alleged that Northbrook had actual knowledge of Moumen's misconduct but chose to look the other way because it wanted to collect fees and grow its business. They further alleged that Northbrook knew the $384,788 Moumen paid himself was unreasonable because his compensation was linked to the funds' profitability and "there was no profit at any point, ever."

¶ 38    Plaintiffs essentially allege that Northbrook should have known that Moumen's transfers were improper, given the circumstances of the case. While they may have alleged suspicious circumstances from which one might infer knowledge, evidence of actual knowledge "cannot be based on circumstances that give rise only to conjecture and suspicion." *Hinton*, 402 Ill. App. 3d at 185. Plaintiffs' allegations of actual knowledge are conjecture based on inference and unsupported by facts. First, plaintiffs infer that Northbrook must have known about the impropriety of Moumen's transfers because it was fully compliant with the BSA. They then surmise that, because Northbrook knew of the impropriety, its actions in allowing the transfers or ignoring policies demonstrated actual knowledge. Actual knowledge based on circumstantial evidence must be "based on established facts and not pyramided on an intervening inference." (Internal quotation marks omitted.) *Id.* Therefore, we find plaintiffs have not pleaded sufficient facts to show that Northbrook had actual knowledge of Moumen's breach of his fiduciary duty to them.

¶ 39    This determination also supports the legislative policy underlying the Act. If banks could be held liable based on mere inference or suspicious circumstances, they would be obligated to inquire into a fiduciary's transactions to ensure nothing was amiss. Requiring banks to

investigate every such transaction would run afoul of the Act's purpose, which is "to facilitate banking and financial transactions." *Johnson*, 30 Ill. App. 3d at 1072. To further that purpose, the Act places "the burden of employing honest fiduciaries" on the principal. *Id.*

¶ 40 Although we have determined that plaintiffs have not sufficiently pleaded actual knowledge, Northbrook may still be liable if it had knowledge of sufficient facts so that its actions in processing Moumen's transfers amounted to bad faith. *Time Savers*, 371 Ill. App. 3d at 768. Bad faith exists where the bank "suspects that the fiduciary is acting improperly and deliberately refrains from investigating in order that [it] may avoid knowledge that the fiduciary is acting improperly." *Edgcomb*, 274 Ill. App. 3d at 436. However, pursuant to the protections afforded by the Act, the bank has no duty to investigate transactions that are "outwardly proper," or not "*per se* alarming." (Internal quotation marks omitted.) *Mikrut*, 359 Ill. App. 3d at 50.

¶ 41 Under the facts alleged in this case, the transfer of money from the funds to Moumen's personal bank and trading accounts was not outwardly improper. Moumen was the manager of the funds and was expected to transfer money for investment purposes. Plaintiffs also acknowledge that Moumen was entitled to 17.5% of the funds' profits and 1% of the total assets under management as fees. As a result, the fact that Moumen occasionally used the transferred monies for personal expenditures was not *per se* alarming. "Mere suspicious circumstances are not enough" to require Northbrook to investigate further, as "there are many legitimate reasons why an agent and principal might engage in odd checking practices." *Johnson*, 30 Ill. App. 3d at 1072.

¶ 42 Moreover, plaintiffs did not allege facts showing that Northbrook deliberately refrained from investigating Moumen's activity so as to avoid knowledge of his misconduct. See *Edgcomb*, 274 Ill. App. 3d at 436. Rather, plaintiffs acknowledged that Northbrook did inquire into certain transfers and that Moumen responded that he was paying himself fees using his personal account as a pass-through account. Pursuant to its policies, Northbrook also inquired into whether Moumen had found a third-party administrator for the funds and warned that it would terminate its relationship with him if he did not obtain one. After Northbrook was served with a subpoena seeking records for the Northbrook fund accounts, it contacted Moumen "within days of receiving the federal subpoena" and subsequently filed a Suspicious Activity Report.

¶ 43 Therefore, we find that plaintiffs have not alleged sufficient facts to show Northbrook acted in bad faith. Plaintiffs disagree with this finding, relying on *Continental Casualty Co. v. American National Bank & Trust Co. of Chicago*, 385 Ill. App. 3d 687 (2008), and *In re Peregrine Financial Group Customer Litigation*, No. 12 C 5546, 2014 WL 4784113 (N.D. Ill. Sept. 25, 2014), as support that Northbrook acted in bad faith. These cases are distinguishable.

¶ 44 In *Continental*, Lawrence Cohn, a fiduciary of General Automation, Inc. (GAI), deposited checks signed by GAI's president and owner and made payable to American National Bank (ANB). The checks were intended to pay GAI's payroll taxes. Cohn, however, attached the checks to a deposit ticket made out to his own personal checking account and deposited the checks into an automated teller machine at ANB. *Continental*, 385 Ill. App. 3d at 688-89. This court's previous opinion in the case found that Cohn's act of depositing the checks into his personal account put ANB on notice that Cohn was acting beyond the scope of his authority, because the checks themselves showed that they were payable to ANB. *Continental Casualty Co.*, 329 Ill. App. 3d at 694. In other words, Cohn's conduct was outwardly improper. The

court also found that ANB failed to inquire into whether Cohn's disposition of the checks was appropriate. *Id.*

¶ 45    *Peregrine* involved the improper use of a special customer segregated account. *Peregrine*, 2014 WL 4784113, *3. The employees at U.S. Bank, N.A., which held the account, permitted transfers of large amounts of money from the account for Peregrine's use. *Id.* Since it was not an ordinary account, special rules were in place regarding the transfer of funds. The plaintiffs further alleged that bank employees regularly reviewed Peregrine's financials and knew it did not turn a profit most years. *Id.* *7. As a result, they had knowledge that Peregrine did not have enough funds to cover the transfers. Therefore, it was "unlikely" for the large number of transfers to have occurred without knowledge of misconduct. *Id.* Since the bank possessed information that should have caused it to investigate, these allegations "g[ave] rise to an inference of bad faith." *Id.*

¶ 46    Unlike *Continental*, where the fiduciary's conduct in depositing corporate checks into his personal account was *per se* alarming, the transfers from the fund accounts by Moumen were not outwardly improper. The funds in *Peregrine* involved a special segregated account with rules limiting transfers. Bank employees also possessed financial information that alerted them to the wrongdoing. Although plaintiffs argue that the CRVF and CREF funds were special funds because some deposits came from IRA accounts, not every investor deposited money from their IRA accounts. Plaintiffs have alleged no facts showing that Northbrook considered the funds to be special segregated accounts or that it was *per se* alarming that it did not do so. Furthermore, plaintiffs alleged that the funds were not profitable but, unlike the case in *Peregrine*, failed to allege how Northbrook employees would have known that fact.

¶ 47    For the reasons set forth, we find that plaintiffs have not alleged sufficient facts to support that Northbrook acted in bad faith.

¶ 48    Plaintiffs' final contention is that the trial court should not have dismissed their claim that Northbrook aided and abetted Moumen's breach of his fiduciary duty. To plead this claim, plaintiffs must sufficiently allege that (1) Moumen performed a wrongful act causing injury, (2) Northbrook was aware of its role in Moumen's misconduct at the time it provided assistance to him, and (3) Northbrook knowingly and substantially assisted Moumen in the violation. *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 27-28 (2003). The term " 'knowingly' implies that the act was performed consciously, intelligently, and with actual knowledge of the facts." *People v. Edge*, 406 Ill. 490, 494 (1950).

¶ 49    We have already determined that plaintiffs did not allege sufficient facts to show that, at the time the transfers occurred, Northbrook had actual knowledge Moumen was breaching his fiduciary duty to plaintiffs. Northbrook could not knowingly assist Moumen in his wrongdoing if plaintiffs have not sufficiently alleged that Northbrook knew Moumen was breaching his fiduciary duty in the first place. We therefore affirm the dismissal of this claim as well.

¶ 50    Plaintiffs argue that dismissal was improper because, at this stage, all well-pled facts must be taken as true and they need not prove their case at the pleading stage. We agree that, in ruling on a section 2-615 motion, the court must take all well-pled facts in the complaint as true. *DeWoskin v. Loew's Chicago Cinema, Inc.*, 306 Ill. App. 3d 504, 513-14 (1999). "However, conclusions of law or fact contained within the challenged pleading will not be taken as true unless supported by specific factual allegations." *Id.* Under Illinois's fact-pleading standard, plaintiffs must allege facts sufficient to bring a claim within a legally recognized cause of action. *Vernon v. Schuster*, 179 Ill. 2d 338, 344 (1997). This pleading

requirement "is not satisfied, in the absence of the necessary allegations, by the general policy favoring the liberal construction of pleadings." *Teter v. Clemens*, 112 Ill. 2d 252, 256-57 (1986). Instead, courts must disregard conclusions of fact, unsupported by factual allegations, when determining whether the pleadings are sufficient to state a cause of action. *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 368-69 (2004).

¶ 51                                          IV. CONCLUSION

¶ 52          For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 53          Affirmed.